ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL[1]

| SUCESIÓN DE JOSÉ RAFAEL CABALLERO TIRADO<br><br>Apelado<br><br>v.<br><br>EDDIE RAMÍREZ<br><br>Apelante | TA2026AP00244 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.: KPE2013-4925<br><br>Sobre: Desahucio |
|---|---|---|

Panel integrado por su presidente, el Juez Candelaria Rosa, el Juez Adames Soto, el Juez Campos Pérez y la Jueza Trigo Ferraiuoli

Campos Pérez, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 11 de junio de 2026.

Comparece el Sr. Eddie Ramírez (señor Ramírez o apelante) y nos solicita que revoquemos la *Sentencia* emitida el 2 de diciembre de 2025, por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI). Mediante el aludido dictamen, el TPI declaró Ha Lugar la *Demanda* de desahucio presentada por la Sucesión del Sr. José Rafael Caballero (Sucesión Caballero o parte apelada)[2], y declaró No Ha Lugar la *Reconvención* presentada por el apelante.

Por los fundamentos que expondremos a continuación, confirmamos la *Sentencia* apelada.

**I.**

El caso de epígrafe tuvo su génesis el 9 de octubre de 2013, ocasión en que la Sucesión Caballero presentó una *Demanda* sobre desahucio contra el señor Ramírez.[3] En esencia, la sucesión alegó que el demandado ocupaba ciertas fincas en carácter de precarista sin pagar canon alguno respecto a ellas. De manera que, solicitó al foro apelado el

---

[1] Mediante Orden Administrativa DJ-2025-063B emitida el 20 de abril de 2026 se enmendó la composición de los paneles.
[2] Sucesión compuesta por: José Antonio Caballero Jiménez, Lillian Mercedes Caballero Ojeda, Luis Miguel Caballero López, María Lourdes Caballero Ojeda, Miguel Aníbal Caballero Tirado, Ramón Edgardo Caballero Rivera, Viola Nilda Caballero Tirado; Caso Núm. KJV2013-0946.
[3] Véase, Apéndice del Apelante, Anejo 2.

desalojo del señor Ramírez. Las fincas en cuestión fueron descritas en la *Demanda* de la siguiente manera:

> A) --Solar con casa en el Barrio Puerta de Tierra de esta ciudad, siendo la casa terrera de madera cobijada de zinc, de 10 varas de frente por 12 de fondo, con un martillo de 2 varas cuadradas que ocupa la cocina y el solar mide 11 metros por el frente Sur, en lindes con la carretera 11.02 metros con el fondo Norte, colindando con terrenos del Pueblo de Puerto Rico; 40 metros por el Este, colindando con casa de Salvador Ledesma y 33.12 metros por la izquierda Oeste, en lindes con solar de la Sociedad A. Álvarez y Hnos., dando esas medidas unas superficie de 433.27 metros cuadrados.-------------------------------------------------------
>
> ---Enclava casa de dos plantas de concreto techada de zinc.-
>
> ---Finca número 124, inscrita al folio 73, del tomo 13 de Puerta de Tierra, Sección I de San Juan.-----------------------
>
> **Propietario Registral**: JOSÉ CABALLERO TIRADO, quien adquiere por compra a Brosmall, Inc., según escritura número 9, otorgada en San Juan, el 9 de septiembre de 1974, ante Walter L. Newsum Junior, Inscrita al folio 74vto., del tomo 13 de Puerta de Tierra, inscripción 11ra.------------
>
>
> B) --Solar marcado con el número 109 del plano de alineación del Barrio de Puerta de Tierra de San Juan, con una superficie de 440.00 metros cuadrados, y mide 20.00 metros de frente por 22.00 metros de fondo, y linda al SUR o frente, con la Avenida Ponce de León, al ESTE o derecha, con Sucesión de Juan Miranda; al OESTE, izquierda, con Jaime Sostre; y al NORTE, espalda con Eduardo Iglesias. En dicho solar había dos casas #10 y #12 que fueron destruidas por un incendio; y en su lugar existen hoy dos hornos de cemento de hacer pan, y una casa de concreto de dos plantas que miden 21.20 metros de frente por 22.00 metros de fondo por la izquierda y 19.00 metros por la derecha y en parte techada de concreto y en parte de zinc. Se llama la atención en cuanto a las medidas de la dicha casa por su frente que son mayores que las del solar.----------------------------------
>
> --Finca número 1,164, inscrita al folio 105 del tomo 11, de Puerta de Tierra, Sección I de San Juan.----------------------
>
> ---**Dominio**: Consta inscrita a favor de JOSÉ CABALLERO TIRADO, quien adquiere por compra de Eduardo Pérez y esposa Carmen Ana Pont de Pérez, según consta en escritura número 14, otorgada en San Juan, el 29 de mayo de 1981, ante Guillermo Cintrón Ayuso, aclarada por la escritura número 15, otorgada en San Juan, el 19 de junio de 1981, ante el mismo notario e inscrita al folio 63 del tomo 23 de Puerta de Tierra, finca número 1,164 inscripción 35ta. y su nota marginal.---------------------------------------------------[4]

---

[4] *Id.*, págs. 2-3.

El 26 de noviembre de 2013, el demandado compareció mediante *Contestación a Demanda y Reconvención.*[5] En resumen, adujo que es el dueño de las propiedades descritas en la *Demanda,* toda vez que fueron adquiridas por conducto de la sociedad que hubo entre éste y el fallecido, el Sr. José Rafael Caballero (causante). Propuso, en la alternativa, haber adquirido las fincas en cuestión por vía de usucapión. Aseveró que para el año 1974, adquirió junto con el causante la propiedad ubicada en Puerta de Tierra, en la que abrieron el restaurante conocido como "La Bota". Alegó que, a partir de ese momento, el restaurante ha estado localizado en el primer nivel del edificio, mientras que el segundo nivel era el espacio donde residía. Sostuvo que la propiedad fue manejada exclusivamente por éste, mientras que los ingresos y/o ganancias del negocio se habían adjudicado exclusivamente a la parte demandante, según acordado por el causante.

El demandado arguyó en su reconvención que la Sucesión Caballero se ha negado a reconocer al señor Ramírez como socio en la sociedad existente entre éste y el causante. Como parte de sus alegaciones, relató que en el año 1959, tanto éste como el Sr. Mike Riley, acordaron abrir en conjunto un restaurante llamado "El Hamburger". Expresó que, para ello, obtuvo un préstamo de su padre, el Sr. Juan Ramón Ramírez. Indicó que, posteriormente, en el año 1963, el señor Ramírez y el señor Riley invitaron al causante —íntimo amigo del demandado desde su infancia— a participar del aludido negocio, quien aceptó la propuesta. Añadió que, acordaron que el señor Caballero se encargaría de la administración y las finanzas del negocio, mientras que el señor Ramírez se encargaría del servicio al cliente, el mantenimiento del espacio, la decoración y la compra de materiales. Aseveró que El Hamburger abrió sus puertas en el año 1963, y tuvo varias localidades

---

[5] Véase, Anejos de la Parte Apelada, Entrada 6 del Sistema Unificado de Manejo y Administración de Casos del Tribunal de Apelaciones (SUMAC-TA), Anejo 4.

hasta que para los años 1974-1975, llegó al lugar donde se encuentra en la actualidad.

Adicionalmente, planteó que en 1974 abrió junto con el causante el negocio La Bota, el cual —según dijimos en los párrafos que preceden— estaba ubicado en el primer nivel del edificio, mientras que su residencia estaba ubicada en el segundo nivel. La propiedad era manejada exclusivamente por el señor Ramírez y los ingresos generados por el negocio fueron adjudicados solamente a él, según acordado por el causante. Argumentó que este acuerdo verbal de constitución de sociedad no fue formalizado por escrito, y que no hizo pago alguno en concepto de renta, como resultado de lo acordado entre los presuntos socios. Adujo que la parte demandante quería desahuciarlo del lugar que había sido su residencia por un término de cuarenta (40) años. Por todo lo anterior, peticionó al foro de instancia que declarase la existencia de la sociedad entre él y el causante, y que lo reconociera como único titular de las propiedades previamente descritas.

Así las cosas, el 12 de diciembre de 2013, la Sucesión Caballero presentó una *Réplica a la Reconvención* mediante la cual arguyó, en suma, que peticionaba el desahucio del demandado, toda vez que ocupaba las fincas en disputa como precarista y no en concepto de dueño.[6] Superados varios incidentes procesales, incluyendo la conversión de la causa de acción sumaria a una de vía ordinaria, el 22 de agosto de 2016, las partes presentaron un *Informe Sobre Conferencia Preliminar entre Abogados y Abogadas*.[7] Estipularon de manera conjunta en el aludido informe que las fincas en disputa estaban inscritas en el Registro de la Propiedad a favor del causante, y que no existía un contrato de sociedad por escrito entre el demandado y el causante.

---

[6] Véase, *Réplica a la Reconvención* en los Autos Originales del caso, Tomo 1.
[7] Véase, *Minuta* de Vista de Primera Comparecencia en los Autos Originales del caso, Tomo I, 23 de octubre de 2013; *Informe sobre Conferencia Preliminar entre Abogados y Abogadas*, en los Autos Originales del caso, Tomo 1, 22 de agosto de 2016.

También estipularon conjuntamente la Resolución sobre Declaratoria de Herederos del señor Caballero.

Por su parte, la Sucesión Caballero estipuló: 1) la inexistencia de un contrato de arrendamiento que autorizara al señor Ramírez a ocupar el bien inmueble; 2) las cargas económicas que han asumido relativas al bien inmueble en cuestión; 3) las escrituras del bien inmueble; y 4) las planillas del caudal relicto de la sucesión. En cambio, el señor Ramírez estipuló —en resumen— el historial de la amistad habida entre éste y el causante, así como el desarrollo de la presunta sociedad compuesta por ellos. Ambas partes coincidieron en que la controversia medular del caso de epígrafe se circunscribía a la existencia de una sociedad, según alegado por el demandado, y la procedencia del desahucio solicitado por la parte demandante. El 24 de agosto de 2016 se llevó a cabo la conferencia con antelación a juicio.[8]

El 21 de marzo de 2018, la Sucesión Caballero presentó una *Moción en Solicitud de Sentencia Sumaria.*[9] Cabe destacar que luego de la presentación de la referida moción, el señor Ramírez se opuso a la disposición sumaria del caso bajo el fundamento de una solicitud tardía.[10] Analizado el asunto, el TPI concluyó que la *Moción en Solicitud de Sentencia Sumaria* de la parte demandante fue formulada a destiempo.[11] No conteste, la Sucesión Caballero presentó un recurso de *certiorari* ante este Foro revisor, quien en aquel momento revocó la orden recurrida y razonó que el foro de instancia debía resolver la moción de sentencia sumaria en sus méritos.[12]

Así pues, —conforme al mandato de este Tribunal de Apelaciones— el 20 de febrero de 2019, el señor Ramírez presentó una *Oposición a "Moción Solicitando [ ] Sentencia Sumaria" Radicada por la Parte*

---

[8] Véase, *Minuta* en los Autos Originales del caso, Tomo 1, 24 de agosto de 2016.

[9] Véase, *Moción en Solicitud de Sentencia Sumaria* en los Autos Originales del caso, Tomo 1, 21 de marzo de 2018.

[10] Véase, Moción no Titulada en los Autos Originales del caso, Tomo 1, 2 de abril de 2018.

[11] Véase, *Orden* del TPI en los Autos Originales del caso, Tomo 1, 31 de agosto de 2018.

[12] Véase, Caso Núm. KLCE201801372.

*Demandante Reconvenida.*[13] Estas mociones dispositivas también fueron objeto de sus respectivas réplicas y dúplicas.[14] Ante lo cual, el 24 de febrero de 2020, el foro apelado emitió una *Resolución* en la que concluyó que no se había configurado una sociedad entre el causante y el señor Ramírez.[15] No obstante, dispuso que no podía dictar sentencia de manera sumaria, toda vez que no estaba en posición de determinar si el demandado ocupaba las fincas en cuestión por mera tolerancia o en carácter de dueño por virtud de un acuerdo verbal. Particularmente, expresó que la sentencia sumaria no era el vehículo adecuado para resolver asuntos de credibilidad o intención. Puntualizó lo siguiente:

> **Siendo que resta por determinar si la propiedad objeto de esta acción ha sido ocupada por el Sr. Ramírez por mera tolerancia del Sr. Caballero o porque de buena fe había un acuerdo entre ambos** y esto es un hecho material para la controversia de desahucio pendiente, se señala vista evidenciaria, a los únicos efectos de establecer si hubo o no contrato verbal entre el demandado y el Sr. Caballero y/o si hubo o no mera tolerancia. [...][16]

Luego de celebradas dos (2) vistas evidenciarias el 14 y 15 de enero de 2021, el foro *a quo* emitió una *Sentencia Enmendada* el 31 de marzo de 2022.[17] En la que declaró Ha Lugar la moción de sentencia sumaria y determinó que las propiedades en cuestión pertenecían a la Sucesión Caballero. Conforme lo anterior, se ordenó el desalojo del señor Ramírez de los inmuebles que ocupaba. Inconforme, el señor Ramírez presentó un primer recurso apelativo a través del cual arguyó que existía una controversia real de hechos que impedían la disposición sumaria del

---

[13] Véase, *Oposición a "Moción Solicitando [ ] Sentencia Sumaria" Radicada por la Parte Demandante Reconvenida* en los Autos Originales del caso, Tomos 2-3, 20 de febrero de 2019.

[14] Véase, *Réplica a Moción en "Oposición" a "Moción en Solicitud de Sentencia Sumaria"* en los Autos Originales del caso, Tomo 3, 20 de marzo de 2019; *Breve Dúplica a Réplica de la Parte Demandante Reconvenida a la Oposición a la Sentencia Sumaria Radicada por la Parte Demandada Reconvencionista* en los Autos Originales del caso, Tomo 3, 1 de abril de 2019.

[15] Véase, *Resolución* del TPI en los Autos Originales del caso, Tomo 3, 20 de febrero de 2020, notificada el 6 de marzo de 2020.

[16] (Énfasis nuestro). *Id.*

[17] Véase, *Sentencia Enmendada* del TPI en los Autos Originales del caso, Tomo 4, 31 de marzo de 2022, notificada el 4 de abril de 2022. La sentencia fue enmendada a los fines de incluir la fianza de apelación; Véase, también, Caso Núm. KLAN202100913.

caso. Este Tribunal de Apelaciones revocó la *Sentencia Enmendada* impugnada y sostuvo lo siguiente:

> [e]n el presente caso, en la medida en que el señor Ramírez logró demostrar que podría tener algún derecho sobre las fincas en cuestión, independientemente de la prueba que acompañó la Sucesión junto con su *Moción en Solicitud de Sentencia Sumaria*, concluimos que incidió el Tribunal de Primera Instancia al disponer sumariamente del pleito. La naturaleza de las alegaciones del apelante hace necesaria la celebración del juicio en su fondo, durante el cual se desfile prueba sobre qué derecho -si alguno- posee el apelante sobre las fincas en cuestión, basado en sus alegaciones de que existió una sociedad con el apelante, o algún otro tipo de acuerdo verbal.

> En cambio, al momento de la celebración del juicio en su fondo, no será necesario el desfile de prueba sobre los hechos esenciales y pertinentes propuestos por la Sucesión como libres de controversia que fueron admitidos por el señor Ramírez en su oposición a que se dicte sentencia sumaria. Así delimitada la controversia, y por los fundamentos expuestos y discutidos, revocamos la *Sentencia [Enmendada]* apelada. [...][18]

Posteriormente, el 22 de octubre de 2024, las partes presentaron una *Moción Conjunta sobre Prueba* mediante la que estipularon, entre otras cosas, que no existía un contrato o escritura pública de sociedad entre el señor Ramírez y el causante.[19] Celebrado finalmente el juicio en su fondo, el 2 de diciembre de 2025, el TPI promulgó la *Sentencia* aquí apelada, mediante la que declaró Ha Lugar la *Demanda* de epígrafe y No Ha Lugar la *Reconvención*.[20] En un extenso dictamen, el foro de instancia consignó un total de 211 determinaciones de hecho, las cuales transcribimos a continuación:

## DETERMINACIONES DE HECHOS

### I. Determinaciones que surgen de la prueba desfilada entre diciembre de 2024 y marzo de 2025:

1. Eduardo William (Eddie) Ramírez nació en 1941, en el estado de New York, EEUU.

2. Actualmente el Sr. Eddie Ramírez reside en Puerta de Tierra, Avenida Constitución 1307, San Juan, P.R.

---

[18] Véase, Caso Núm. KLAN202200266.
[19] Véase, *Moción Conjunta sobre Prueba* en los Autos Originales del caso, Tomo 4, 22 de octubre de 2024.
[20] Véase, *Sentencia* aquí apelada del TPI en los Autos Originales del caso, Tomo 5, 2 de diciembre de 2025, notificada el 9 de diciembre de 2025.

3. El Sr. Eddie Ramírez conoció al Sr. José Caballero porque eran vecinos en New York.

4. El Sr. José Caballero regresaba en aquel entonces de servir en el ejército de los Estado Unidos de América.

5. El señor Ramírez era menor de edad cuando conoció al señor Caballero.

6. El señor Ramírez, tenía 15 años y el Sr. José Caballero era un poco mayor, cuando firmaron con sangre un acuerdo en el que manifiestan su compromiso de cuidarse mutuamente en esta vida y en la próxima.

7. El señor Ramírez y el señor Caballero llamaron a este acuerdo "Código 11".

8. El señor Ramírez llegó a Puerto Rico en septiembre de 1959, a vivir en casa de una tía, y su primer trabajo fue en el restaurante El Mediterráneo como *maitre d.*

9. El señor Ramírez y el señor Caballero mantuvieron comunicación mediante cartas.

10. En Puerto Rico, el señor Ramírez conoció al Sr. Michael Riley, propietario de un edificio que contenía varios negocios, ubicado en el #151 de la calle Tetuán, Viejo San Juan.

11. Uno de esos negocios era El Chaleco Rojo, en el que el señor Ramírez llegó a trabajar.

12. El señor Caballero llegó a Puerto Rico en 1963, ya que el señor Ramírez lo escogió como padrino de bautizo de su primer hijo.

13. El señor Ramírez le propuso al señor Caballero que se uniera a trabajar con el señor Riley y así comenzaron a trabajar en El [Hamburger].

14. El [Hamburger] ocupaba una esquina que el señor Riley había dedicado a la venta de comida en su edificio de la calle Tetuán.

15. El señor Riley regresó definitivamente a EEUU, entonces el señor Ramírez y el señor Caballero le compraron al Sr. Pepe Martínez la llave de otro negocio, también en la calle Tetuán.

16. Ramírez y Caballero abrieron El [Hamburger] donde había estado el negocio del Sr. Pepe Martínez; el edificio era propiedad del señor Gandía.

17. Luego adquirieron un segundo negocio en la Calle Luna, en ambos locales se dedicaban a vender hamburguesas.

18. Para el señor Ramírez, el señor Caballero era generoso, atento, y un gran amigo.

19. El señor Caballero era conocido por ser "la mente de los negocios", "era tremendo comerciante" y siempre encontraba formas para generar dinero.

20. El señor Ramírez se encargaba de atender al público.

21. En 1964, el señor Caballero y el señor Ramírez [e] inauguraron el restaurante La Bota.

22. Los productos promocionales llevaban los logos de ambos restaurantes por un lado decían El [Hamburger] y por el otro La Bota.

23. Los productos promocionales eran productos como por ejemplo paraguas, un bulto/neverita etc.

24. El restaurante La Bota comenzó en la esquina de la Calle Luna con la Calle Norzagaray, en el Viejo San Juan.

25. En 1972, el señor Caballero y el señor Ramírez compraron el "Panamerican Bar", ubicado en la calle Tetuán $153 y pasaron tanto La Bota como El [Hamburger] a ese edificio, por espacio de siete años.

26. Luego más nunca estuvieron ambos negocios compartiendo el mismo local, excepto por un tiempo determinado que respondió a los daños que ocasionó el paso del Huracán Hugo.

27. El [Hamburger] y La Bota compartieron algunos artículos promocionales, como sombrillas y bultos /neveras.

28. El Sr. José Caballero invertía su dinero en propiedades.

29. El Sr. José Caballero utilizaba al Sr. Rogelio Díaz como su corredor de bienes raíces.

30. Ni en las escrituras de compraventa, ni en el registro de la propiedad aparecen otros dueños de los inmuebles objeto de este caso.

31. El Sr. José Caballero siempre pagó las contribuciones de las propiedades objeto de este caso.

32. En 1980, el señor Caballero compró la propiedad en #307 de la Ave. Constitución, San Juan, Puerto Rico.

33. La propiedad estaba en muy malas condiciones y el señor Caballero se encargó de habilitarla.

34. El señor Caballero manifestó al señor Ramírez, que había adquirido esta propiedad para que el señor Eddie Ramírez la viviera.

35. Actualmente, el señor Ramírez reside la propiedad y la mantiene.

36. En la década de los años ochenta, el restaurante La Bota pasó a ser La Bota Grill y cambió su concepto, decoración y menú, enfocándose principalmente en la venta de carnes.

37. En el 1984, el señor Caballero y el señor Ramírez cerraron la única cuenta de banco que tuvieron juntos, era una cuenta del banco Scotiabank.

38. Luego del 1984, el señor Ramírez y el señor Caballero no volvieron a tener cuentas de banco en conjunto.

39. En 1984, el señor Ramírez solicitó un préstamo en "Fomento Económico" por $250,000.00 para comprar el edificio Tetuán #155.

40. En 1985 el Sr. Ramírez creó el restaurant Tetuán 20, en el recién adquirido edificio.

41. El señor Caballero no solicitó el préstamo junto con el señor Ramírez.

42. El señor Caballero no compró el edificio Tetuán 20 junto con el señor Ramírez.

43. El señor Ramírez solicitó el servicio de electricidad para el negocio La Bota con dirección Muñoz Rivera #330, que es lo mismo que Ponce de León 4307.

44. Para 1991, el Sr. Eduardo Ramírez, hijo, era gerente de La Bota.

45. El señor Ramírez hijo tenía autorización para hacer encargos, firmar facturas y recibir las órdenes.

46. En 1991, el señor Ramírez, hijo, hizo un cheque de la cuenta del restaurante La Bota para transferir dinero a la cuenta del restaurante Tetuán 20.

47. En el 1991, el señor Ramírez autorizó que se grabara un comercial de la cerveza "Budweiser" en el restaurante La Bota.

48. Cuando cerró el restaurante Tetuán 20, el señor Ramírez abrió el restaurant "Ocean Grill".

49. El restaurante "Ocean Grill" duró poco porque para ese tiempo muchos profesionales cuyas oficinas estaban en el Viejo San Juan migraron hacia Hato Rey.

50. El Sr. Eddie Ramírez atendía el restaurante La Bota, hacía los encargos a los suplidores y luego el señor Caballero pagaba la factura.

51. Los encargos a los suplidores no se hacían en conjunto, el señor Ramírez encargaba lo que necesitaba en el restaurante La Bota y lo que necesitaba el restaurante El [Hamburger] lo encargaba otra persona en pedido aparte.

52. El señor Ramírez cuenta con copias de facturas de suplidores de La Bota hasta el año 1993.

53. En la mayoría de las facturas el señor Ramírez aparece como la persona encargada, ya que fue quien realizó la orden.

54. El Sr. Félix Rabel también aparece como encargado en las facturas de las órdenes que él realizó, este era el uso y costumbre.

55. El Sr. Félix Rabel era empleado de confianza del Sr. José Caballero.

56. El 27 de abril de 1993, un suplidor envió una carta de cobro, el señor Ramírez no recordaba la razón para la falta de pago.

57. El señor Caballero pagaba a sus empleados en efectivo.

58. El señor Caballero enviaba al señor Ramírez entre $1,000.00 y $1,200.00 semanales, en efectivo.

59. El señor Ramírez hacía sus compras personales con el dinero que recibía del señor Caballero.

60. El Sr. Rafael Tufiño conoció tanto a José Caballero como a Eddie Ramírez desde su juventud, ya que vivía en Viejo San juan.

61. El señor Tufiño trabajó con el señor Caballero cuando tenía 12 o 13 años.

62. El señor Tufiño testificó que el señor Caballero estaba en El [Hamburger] y el señor Ramírez en La Bota.

63. El señor Tufiño fue el administrador de El [Hamburger] ubicado en la calle San Sebastián.

64. Para el señor Tufiño, el señor Caballero tenía una visión adelantada del mercado.

65. El señor Tufiño testificó que el señor Ramírez tomó el control de La Bota y Caballero tomó el control de El [Hamburger].

66. Para el señor Tufiño, el señor Ramírez tenía a su grupo de empleados en La Bota y el señor Caballero tenía a su grupo de empleados en El [Hamburger], ambos lugares tenían "libretos" diferentes.

67. Los edificios donde se establecieron finalmente La Bota y El [Hamburger] eran propiedad de José Caballero, pero Tufiño nunca supo cuál era el arreglo entre Caballero y Ramírez.

68. En un momento Tufiño también fue dueño de un restaurant El [Hamburger] que ubicó en el #106 de la calle San Sebastián.

69. El señor Tufiño no era socio de Caballero, sino que cada cual tenía y administraba su negocio, aunque se llamaran igual.

70. En un momento el señor Tufiño adquirió dos propiedades con Caballero, pero con el tiempo el señor Caballero le compró su participación.

71. El [Hamburger] y La Bota no compartían cuentas de banco.

72. Las finanzas de El [Hamburger] y las finanzas de La Bota se mantenían separadas, aunque el señor Caballero hiciera pagos en favor de ambos negocios.

73. El señor Ramírez tenía una cuenta de banco "flexi cuenta" bajo el nombre Eddie Ramírez Santos DBA La Bota.

74. El [Hamburger] no aceptaba tarjetas de crédito.

75. La Bota sí aceptaba tarjetas de crédito, menos Master Card.

76. El concepto de La Bota cambió durante los años.

77. Con el mismo nombre La Bota, en distintos momentos el negocio fue un "Night Club", un "Pub", Un "Steakhouse" y un "Grill".

78. El concepto de El [Hamburger] ha permanecido igual a través de los años.

79. Para el año 2000, el Sr. Ramírez pasaba muy poco tiempo en El [Hamburger], sin embargo, se ocupaba del restaurant La Bota.

80. El 30 de septiembre de 2002, el Lcdo. Jorge Rodríguez Micheo, hijo, envió una carta a la Federación de Alcaldes para ratificar unos acuerdos.

81. En la carta, Rodriguez Micheo se refiere al señor Ramírez como dueño de la propiedad en la que ubica el restaurante La Bota.

82. El Lcdo. Rodríguez Micheo escribió la carta con la información que le proveyó el señor Ramírez.

83. El señor Ramírez autorizó los acuerdos haciendo negocios como La Bota.

84. Los acuerdos eran con relación al alquiler de un solar colindante al restaurante La Bota para ser usado como estacionamiento de La Federación de Alcaldes.

85. El Sr. Cándido Villanueva era el cocinero en La Bota Grill y luego cuando cambió de concepto, se quedó como cocinero de La Bota.

86. Para el 2012, La Bota se componía de Cándido Villanueva y el señor Ramírez.

87. Para el 2012, ya La Bota no generaba ganancia.

88. La Bota cerró cuando murió el Sr. Cándido Villanueva.

89. Cuando el señor Caballero enfermó, dejó a su hermano Miguel Caballero y su esposa manejando El [Hamburger].

90. El Sr. Eddie Ramírez no participó en la decisión sobre quién atendería El [Hamburger] ante la enfermedad de Caballero.

91. El señor Ramírez adquirió, mediante escritura de compraventa, una propiedad en la Carr. 187 Km. 8.9 Bo. Piñones, Torrecilla Baja, Loíza.

92. El señor Ramírez no adquirió la propiedad junto con el señor Caballero.

93. El Sr. Eduardo Ramírez Flores es el hijo del demandado Sr. Eddie Ramírez.

94. Ramírez Flores es CPA y se pagó sus estudios trabajando en El [Hamburger].

953. Cuando Ramírez Flores quiso comenzar a trabajar en El [Hamburger] le pidió permiso al señor Caballero, quien le permitió trabajar.

96. En 1982, Ramírez Flores comenzó a trabajar a tiempo parcial en El [Hamburger].

97. Luego del 1984 y hasta el 1988 Ramírez Flores trabajó a tiempo completo. Fue cocinero, mozo, cajero y gerente.

98. El señor Caballero fue el mentor de Ramírez Flores.

99. En el 1985 y el 1987, trabajó en La Bota de 5.00 pm a 2:00 am, como gerente nocturno.

100. Para esos años, las decisiones de los negocios las tomaban entre Ramírez y Caballero.

101. Luego de que Ramírez Flores se graduó de CPA, el señor Caballero le consultaba sobre asuntos de contabilidad y contributivos.

102. El Sr. Miguel Méndez Balasquide es amigo del señor Ramírez desde la década del 1970.

103. Méndez Balasquide conoció a Ramírez socialmente, pero lo vio trabajando en El [Hamburger] de Viejo San Juan, no en el de Puerta de Tierra.

104. Méndez Balasquide solía almorzar con el señor Ramírez y con el señor Caballero en el restaurant La Bota.

105. Méndez Balasquide vio que el señor Caballero llegaba a La Bota con un sobre con dinero que le entregaba al señor Ramírez.

106. Méndez Balasquide no hablaba mucho con Ramírez sobre negocios.

107. En una ocasión que si hablaron de negocios, Méndez Balasquide le recomendó a Ramírez que aclarara por escrito con Caballero los negocios que tenían juntos.

108. Ramírez le contestó a Méndez Balasquide que no podía poner nada por escrito, pero no le dio razones.

109. El Sr. William Ramírez Castellano es hijo del demandado Sr. Eddie Ramírez.

110. El señor Ramírez Castellanos visitaba La Bota semanalmente y El [Hamburger] más o menos una vez al mes.

111. El señor Ramírez Castellanos presenció conversaciones entre Ramírez y Caballero sobre reparaciones o arreglos a los restaurantes.

112. El costo de las reparaciones las pagaba Caballero.

113. El señor Ramírez Castellanos presenció además que empleados del El [Hamburger] llegaban a La Bota y le traían dinero a Ramírez semanalmente.

114. El señor Ramírez Castellanos observó en ocasiones que su padre ponía el dinero en la caja registradora o en su bolsillo.

115. El sobre en el que llegaba el dinero no tenía ninguna seña, ni venía acompañado de ningún otro documento.

116. El señor Ramírez Castellanos desde su niñez conoció a Caballero y lo consideraba familia.

117. Cuando Ramírez Castellanos necesitó comprar una casa, le pidió dinero para el pronto pago a su padre Eddie Ramírez.

118. El Sr. Eddie Ramírez lo instruyó a que fuera a donde el Sr. José Caballero a pedirle el dinero.

119. El señor Caballero le dio a Ramírez Castellanos $11,000.00 para la compra de su primer hogar.

120. Ramírez Castellano es arquitecto y no conoce lo que es una sociedad civil, ni una sociedad mercantil.

121. El Sr. Edward Michael Ramírez Castellano es hijo del Sr. Eddie Ramírez y ahijado del señor Caballero.

122. El Sr. Edward Ramírez se dedica a la administración de hoteles.

123. El Sr. Edward Ramírez entiende que el dinero que su padre recibía era salario por su trabajo ya que vio a su papá en El [Hamburger] atender clientes y trabajar la parrilla.

124. El Sr. Edward Ramírez testificó que los suministros de La Bota y de Tetuán 20 venían de El [Hamburger].

125. El Sr. Edward Ramírez testificó que el señor Caballero lo pagaba todo, se encargaba de pagar las nóminas y le daba a Eddie Ramírez un sobre con dinero en efectivo.

126. El Sr. Edward Ramírez testificó que el dinero del sobre era la paga a Eddie Ramírez por su salario.

127. El Sr. Edward Ramírez no hablaba con su papá de El [Hamburger] porque su papá trabajaba en Tetuán 20.

128. El Sr. Edward Ramírez testificó que su padre, Eddie, quería remodelar El [Hamburger], pero José Caballero no quería, entonces El [Hamburger] no se remodeló.

129. El Sr. Enoel Rodríguez Rivera es músico, repostero y comerciante.

130. El Sr. Enoel Rodríguez Rivera vivió en Puerta de Tierra desde la década del 1970 hasta la década del 1990.

131. El señor Rodríguez Rivera conoció a Eddie Ramírez en Tetuán 20 y a José Caballero en El [Hamburger].

132. Para el señor Rodríguez Rivera, Eddie Ramírez y José Caballero eran como socios porque eran como hermanos.

133. El señor Rodríguez Rivera percibió que Eddie Ramírez y José Caballero compartían como hermanos, aun así, le recomendó a Eddie Ramírez que pusiera los negocios por escrito.

134. El señor Rodríguez Rivera trabajó para José Caballero en El [Hamburger] atendiendo la seguridad, porque el negocio generaba mucho efectivo.

135. Si Rodríguez Rivera presenciaba alguna irregularidad, hacía un informe y se lo daba a José Caballero.

136. El Sr. Feliz Miguel Rabel Rivera comenzó a trabajar en El [Hamburger] como cocinero y estuvo trabajando allí por 55 años en total.

137. El señor Rabel tuvo varias funciones durante los años que trabajó en El [Hamburger].

138. El señor Rabel testificó que el Sr. José Caballero le dedicaba doce horas, siete días a la semana a El [Hamburger].

139, El señor Rabel no conoció otro dueño de El [Hamburger], que no fuera José Caballero.

140. En adición a su sueldo, José Caballero le pagaba la casa a Rabel y los estudios de sus hijos, porque era una persona muy generosa.

141. A pesar de estos pagos, el señor Rabel no se considera socio de Caballero.

142. El señor Rabel era un empleado de confianza.

143. El señor Rabel veía a Eddie Ramírez ir a El [Hamburger] a almorzar, pero a nada más.

144. Para principios de los años 2000, el señor Rabel trabajaba en El [Hamburger] y era el asistente de José Caballero.

145. Rodríguez Rivera testificó que Eddie Ramírez quería que José Caballero despidiera a Rabel.

146. Rodríguez Rivera testificó que la razón que dio Ramírez era que había presenciado al empleado robando.

147. José Caballero no le dio credibilidad a Eddie Ramírez y Rabel permaneció trabajando como hasta ese momento. La hija de Rabel también trabajaba en El [Hamburger].

148. El Sr. Adalberto Arroyo Rodón trabaja en El [Hamburger] desde 1991, ha sido mesero, supervisor y gerente.

149. El señor Arroyo Rodón fue supervisor de El [Hamburger] desde el 2000 hasta el 2020 que pasó a ser gerente.

150. Trabajaba para José Caballero que era el dueño de El [Hamburger].

151. El señor Arroyo Rodón testificó que Eddie Ramírez era amigo y compadre de José Caballero; era el encargado de La Bota.

152. El señor Arroyo Rodón testificó que Eddie Ramírez no era socio ni dueño del El [Hamburger].

153. El señor Arroyo Rodón veía a José Caballero repartir sobre 40 [sobres] los viernes por la tarde.

154. Los sobres contenían el pago de la nómina de El [Hamburger] y de La Bota, los pagos para gastos operacionales, reparaciones etc.

## II. Determinaciones que surgen de la prueba desfilada en enero de 2021.

Las determinaciones de hecho que anteceden surgen del segundo juicio en su fondo celebrado a raíz de la orden que surge de la sentencia del Tribunal de Apelaciones. Durante el juicio, ambas partes solicitaron que se tomara conocimiento de los testimonios vertidos en el juicio celebrado los días 14 y 15 de enero de 2021. Lejos de contradecirse, la prueba desfilada en el segundo juicio coincide con la prueba del primer juicio. De la prueba desfilada en el 2021, que ambas partes solicitaron que se tomara conocimiento, surgen las siguientes determinaciones de hechos:

1. El Sr. Rafael Tufiño ll es artista plástico de profesión, y en conjunto con Don José y Don Eddie formaron el restaurante La Bota.

2. Los tres se conocían desde jóvenes ya que lavaban carros en el estacionamiento de la Catedral de San Juan.

3. El Sr. Mike Riley regularmente les pedía que lo ayudaran en sus negocios.

4. El Sr. Mike Riley fue el fundador original del restaurante El [Hamburger].

5. La relación entre el Sr. José Caballero y el Sr. Eddie Ramírez era una de amistad cercana, tanto así que parecían hermanos.

6. Al llegar a la mayoría de edad, José Caballero y Eddie Ramírez se mantuvieron incursionando en el campo de los negocios.

7. El Sr. José Caballero mostró desde joven interés en adquirir propiedades inmuebles.

8. Los tres amigos administraron negocios en viejo San Juan y Puerta de Tierra.

9. Ante el éxito del restaurante El [Hamburger] de Puerta de Tierra. José Caballero decidió que el Sr. Tufiño administrase el restaurante con el mismo nombre que ubicaba en Viejo San Juan y a Don Eddie que administrarse el restaurante La Bota.

10. Rogelio Díaz Castán, corredor de bienes raíces, conoció al Sr. Eddie Ramírez y al Sr. José Caballero desde los años sesenta cuando acudía a almorzar a El [Hamburger].

11. Su percepción era que entre Caballero y Ramírez existía una amistad muy cercana, que más bien parecían ser familia.

12. Para el año 1973, el Sr. José Caballero le pidió al Sr. Rogelio Díaz que le consiguiera una casa en Puerta de Tierra.

13. En el 1974, el Sr. Rogelio Díaz consiguió la propiedad que ubica en el #307 de la Avenida Ponce de León, San Juan, Puerto Rico.

14. La propiedad la compró el Sr. José Caballero y la vivió el Sr. Eddie Ramírez, con anuencia del Sr. José Caballero.

15. La propiedad estaba en muy malas condiciones de manera que tomó varios años poder habitarla.

16. La propiedad se compró con originalmente para que el Sr. Eddie Ramírez la viviera, sin embargo, el restaurant El [Hamburger] estuvo un tiempo en ese local.

17. Entre los años 1980 y 1981 el Sr. Eddie Ramírez montó el restaurante La Bota en el primer piso del edificio donde ubica actualmente y acondicionó el segundo piso para usarlo como residencia.

18. El Sr. Eddie Ramírez diseñó el espacio de lo que sería su casa en el segundo piso del local y pagó por los trabajos de remodelación.

19. Para pagar los trabajos de remodelación utilizó el dinero que había obtenido de la venta de un apartamento en Torre de la Reina.

20. El Sr. Eddie Ramírez ocupaba el segundo piso de La Bota con el consentimiento del Sr. José Caballero.

21. No hay ningún documento que traspase la titularidad de la propiedad al señor Ramírez.

22. El señor Ramírez nunca pagó renta al señor Caballero.

23. El señor Caballero y el señor Ramírez [ ] trabajaron en múltiples negocios juntos.

24. Las reparaciones que requería el inmueble con el tiempo se costearon con el dinero de los negocios del Sr. José Caballero y el Sr. Eddie Ramírez.

25. Los permisos para comenzar a operar el restaurante La Bota, estuvieron a nombre del Sr. José Caballero.

26. El Sr. Benjamín López trabajó para el Sr. José Caballero desde el año 1990.

27. El Sr. José Caballero enviaba al Sr. Benjamín López a hacer reparaciones de construcción menor y mantenimiento regular al restaurante La Bota.

28. Tanto la mano de obra, como los materiales de los arreglos que hacia el Sr. Benjamín López, los pagaba el Sr. José Caballero.

29. El Sr. José Caballero no pedía permiso al Sr. Eddie Ramírez para hacer estas reparaciones.

30. El Sr. Benjamín López le decía al Sr. Eddie Ramírez, que venía de parte de José Caballero para hacer lo que éste le había mandado y Eddie Ramírez nunca puso resistencia.

31. El Sr. José Caballero pagaba las utilidades del restaurante La Bota mediante cheques y enviaba a Benjamín López a hacer esos pagos.

32. El Sr. Eddie Ramírez no ha vivido ininterrumpidamente en los altos del restaurante La Bota.

33. El Sr. Eddie Ramírez tiene una casa de playa ubicada en Piñones, donde vivió por años.

34. Entre el 1987 y el 1988 Don Feliz Miguel Rabel Rivera vivió en el edificio donde ubica el restaurante La Bota.

35. Durante los años del 1988 al 1990 la Sra. Rabel Negrón vivió en los altos de La Bota con su esposo el Sr. Luis Ruiz y su hija.

36. El Sr. José Caballero les permitió vivir en el segundo piso del restaurante La Bota por ese tiempo.

37. Mientras la Sra. Rabel Negrón ocupó el segundo piso, en el tercer piso del edificio vivían Doña Elsa y Don Pablo Rosario.

38. El Sr. Eddie Ramírez no vivió en los altos del restaurante La Bota por ese tiempo.

39. La señora Rabel trabajó como secretaria de José Caballero desde sus doce años de edad, hasta el 2010 que se retiró.

40. La relación entre la señora Rabel y el Sr. José Caballero era más que profesional, era de familia, ya que ella le quería como a un tío.

41. La relación afectuosa se debía a que José Caballero acogió al papá de la señora Rabel desde que éste tenía 16 años, le dio trabajo y dirección en la vida.

42. El Sr. José Caballero siempre se comportó como el dueño del local del restaurante La Bota y se refería a Eddie Ramírez como la persona que corría el negocio.

43. La señora Rabel preparaba los cheques para pagar los gastos del Restaurante La Bota y José Caballero los firmaba.

44. José Caballero realizaba todos los pagos para correr el restaurante La Bota, incluso la compra de suministros para preparar la comida que se vendía en el restaurante.

45. Durante el tiempo en que la señora Rabel trabajó para el Sr. José Caballero, el Sr. Eddie Ramírez no hizo ningún pago a José Caballero.

## III. Estipulaciones de hecho que surgen del informe de conferencia con antelación al juicio.

1. El inmueble objeto del desahucio está inscrito en el Registro de la Propiedad a nombre del causante de los demandantes.

2. No existe ninguna escritura de Sociedad mercantil o civil, tampoco un contrato escrito de Sociedad entre el causante de los demandantes y el demandado.

3. Se estipula la Resolución sobre Declaratoria de Herederos del causante José Caballero.

## IV. Estipulaciones de hecho que surgen de la moción conjunta sobre prueba del 22 de octubre de 2024.

1. No existe ninguna escritura de sociedad mercantil o civil ni tampoco contrato de sociedad entre el Sr. José Rafael Caballero Tirado y el demandado.

2. Al 15 de enero de 2013, cuando falleció el Sr. José Rafael Caballero Tirado, el único titular registral de la Finca número 124, inscrita en el folio 73, del tomo 13 de Puerta de Tierra, Sección II de San Juan, era el Sr. José Rafael Caballero Tirado.

3. Al 15 de enero de 2013, cuando falleció el Sr. José Rafael Caballero Tirado, el único titular registral de la Finca número 1,164, inscrita al folio 105 del tomo 1 de Puerta de Tierra, Sección 1 de San Juan era el Sr. José Rafael Caballero Tirado.

4. Antes del Sr. José Rafael Caballero fallecer, este no cedió, donó o vendió ninguna de las dos propiedades en controversia al Sr. Eduardo Ramírez por lo que no existe escritura pública a esos efectos.

5. La parte demandada nunca le compró al Sr. José Rafael Caballero Tirado propiedad alguna.

6. El Sr. Eduardo Ramírez invertía comprando propiedades y hacía negocios independientemente del Sr. José Rafael Caballero Tirado.

7. El dinero que la parte demandada recibía por concepto de la "alegada sociedad" entre este y el causante para llevar el negocio conocido como El Hamburger nunca fue reportado como ingreso por la parte demandada.

8. El Sr. Eduardo Ramírez nunca compartió con el causante, Sr. José Rafael Caballero Tirado, las ganancias generadas por el negocio conocido como La Bota, el cual la parte demandada alega era parte de la sociedad civil entre ambos.

9. El Sr. Eduardo Ramírez ocupó las propiedades en controversia sin pagar arrendamiento alguno al causante y sin tener título de ninguna de las propiedades.[21]

El foro apelado concluyó que la promesa mutua que hicieron el demandado y el causante de cuidarse recíprocamente no configuró un contrato de sociedad. Dispuso, que la prueba no demostró que los señores Ramírez y Caballero pusieran dinero, bienes, e industria con el ánimo de partir las ganancias. Señaló que el señor Caballero pagaba semanalmente entre $1,000.00 y $1,200.00 en efectivo al señor Ramírez en concepto de salario. Con respecto a las fincas en cuestión, determinó que fue el causante quien las adquirió para el uso del demandado sin tener la intención de cedérselas.

Además, razonó que el señor Ramírez sabía que el causante era el titular de las propiedades, quien a su vez permitió que viviera en ellas. El foro *a quo* dispuso que, en la medida en que el caso de epígrafe trataba sobre la existencia de una sociedad sobre los bienes inmuebles en disputa, el *quantum* de prueba requería presentar una escritura pública sobre el pacto entre los socios. Con respecto a las alegaciones que hizo el demandado sobre prescripción adquisitiva, sostuvo que nunca ocupó

---

[21] *Id.*

las propiedades en concepto de dueño, toda vez que permanecía allí porque el causante —y titular de las fincas— así lo permitió. Por todo lo anterior, ordenó el desalojo del demandado de las aludidas propiedades.

El 29 de diciembre de 2025, el señor Ramírez presentó una *Moción de Reconsideración*, para la cual la Sucesión Caballero presentó una *Oposición a Moción de Reconsideración* el 13 de enero de 2026.[22] Aun así, el 6 de febrero de 2026, el TPI emitió una *Resolución* mediante la cual declaró No Ha Lugar la solicitud de reconsideración.[23]

En desacuerdo, el 7 de marzo de 2026, el señor Ramírez presentó el recurso apelativo que nos ocupa, en el que le imputó al foro de instancia la comisión de los siguientes errores:

> **PRIMERO:** ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR EN SU SENTENCIA QUE NO QUEDÓ DEMOSTRADO QUE ENTRE EL SR. RAMÍREZ Y EL SR. CABALLERO HUBIERA UNIÓN DE VOLUNTADES PARA DETERMINAR QUE EXISTIÓ UNA SOCIEDAD Y QUE NO HUBO ENTRE LOS DOS AMIGOS UNA OBLIGACIÓN DE PONER EN COMÚN DINERO, BIENES O INDUSTRIA CON ÁNIMO DE PARTIR LAS GANANCIAS IGNORANDO LA PRUEBA TESTIFICAL Y DOCUMENTAL QUE LO CONTRADICE Y QUE PRIVA INJUSTAMENTE AL DEMANDADO, EL SR. EDDIE RAMÍREZ, DEL DERECHO QUE TIENE COMO PARTICIPANTE ACTIVO DE LA COMUNIDAD DE BIENES COMPRENDIDA ENTRE RAMÍREZ Y CARABALLO. OMITE ASÍ EL TRIBUNAL DE PRIMERA INSTANCIA LA EXISTENCIA DE LA SOCIEDAD DE HECHO Y LA COMUNIDAD DE BIENES EXISTENTE ENTRE EL DEMANDADO EDDIE RAMÍREZ Y JOSÉ CABALLERO Y LA APORTACIÓN DE INDUSTRIA DE PARTE DE RAMÍREZ AL ENTENDER ERRÓNEAMENTE QUE, POR LA FALTA DE UN CONTRATO ENTRE LAS PARTES NO SE JUSTIFICA LA PERMANENCIA DEL SR. RAMÍREZ EN LA PROPIEDAD IGNORANDO ASÍ LA VALIDEZ DE LAS SOCIEDADES DONDE SE PONE EN COMÚN LA INDUSTRIA.
>
> **SEGUNDO:** ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL PERMITIR CON SU SENTENCIA QUE SE VIOLENTE LA DOCTRINA DE ACTOS PROPIOS TENIENDO COMO CONSECUENCIA UN ENRIQUECIMIENTO INJUSTO PARA LA PARTE DEMANDANTE PERMITIENDO QUE LA SUCESIÓN TENGA ACCESO A BIENES CUYA PLUSVALÍA Y MANTENIMIENTO FUERON GENERADOS POR EL ESFUERZO DEL DEMANDADO, SIN MEDIAR LIQUIDACIÓN PREVIA.[24]

---

[22] Véase, *Moción de Reconsideración* en los Autos Originales del caso, Tomo 5, 29 de diciembre de 2025; *Oposición a Moción de Reconsideración* en los Autos Originales del caso, Tomo 5, 13 de enero de 2026.

[23] Véase, *Resolución* en los Autos Originales del caso, Tomo 5, 6 de febrero de 2026.

[24] Véase, Entrada 1 del SUMAC-TA.

El 25 de marzo de 2026, la Sucesión Caballero presentó su *Alegato de la Parte Apelada.*[25] De manera excepcional, aceptamos la *Réplica a Oposición a Moción de Reconsideración* y la *Dúplica en Cumplimiento de Orden* de las partes litigantes.[26] Con el beneficio de ambas comparecencias, nos encontramos en posición de resolver.

## II.

## A.

Nuestro más Alto Foro ha definido el desahucio como el remedio que tiene el propietario de un inmueble para recobrar judicialmente su posesión, de aquel arrendatario o precarista que se mantiene en ella sin pagar canon alguno. *Markovic v. Meldon y otro,* 216 DPR __; 2025 TSPR 99, pág.4; *SLG Ortiz-Mateo v. ELA,* 211 DPR 772, 799 (2023); *Adm. Vivienda Pública v. Vega Martínez,* 200 DPR 235, 240 (2018); *ATPR v. SLG Volmar-Mathieu,* 196 DPR 5, 10 (2016). Usualmente, se reconoce como una acción especial de carácter sumario que responde al interés del Estado de atender con prioridad la reivindicación de la posesión y el disfrute de un bien inmueble. *Markovic v. Meldon y otro, supra,* pág. 4; *SLG Ortiz-Mateo v. ELA, supra,* pág. 799; *Adm. Vivienda Pública v. Vega Martínez, supra,* pág. 240; *ATPR v. SLG Volmar-Mathieu, supra,* pág. 9.

Regulada por el Código de Enjuiciamiento Civil, la acción sumaria de desahucio solamente persigue recobrar la posesión de un inmueble. *Markovic v. Meldon y otro, supra,* pág. 4; *ATPR v. SLG Volmar-Mathieu, supra,* pág. 10. Aquellos asuntos relativos a conflictos de titularidad deben dirimirse en un pleito ordinario. *Markovic v. Meldon y otro, supra,* pág. 4; *ATPR v. SLG Volmar-Mathieu, supra,* pág. 10; *C.R.U.V. v. Román,* 100 DPR 318, 322 (1971). Existe un conflicto de título cuando la parte demandada opone un título de dominio que tiende a demostrar que no está poseyendo en calidad de precarista, arrendatario, administrador o

---

[25] Véase, Entrada 6 del SUMAC-TA.
[26] Véase, Entradas 7 y 10 del SUMAC-TA.

custodio del bien inmueble. *Markovic v. Meldon y otro, supra,* pág. 4; *Martínez Santiago v. Dalmau Andrades,* 93 DPR 191, 194 (1996).

Para que el demandante en una acción de desahucio en precario prevalezca, debe probar de manera *prima facie* su caso. *Escudero v. Guzmán,* 96 DPR 299, 302 (1968). Es decir, debe presentar evidencia con respecto a su título sobre la propiedad y que esa propiedad está en posesión del demandado en precario. *Id.* En lo que nos concierne, el Tribunal Supremo ha resuelto que, generalmente, la posesión en precario se origina por actos de liberalidad o tolerancia, o por el abandono o desconocimiento del dueño. *Sucn. J. Serrallés v. Loyola,* 67 DPR 217, 219 (1947).

**B.**

(i)

Es norma conocida que, bajo la teoría general de obligaciones y contratos, las partes contratantes "pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, la moral, ni al orden público". *Rodríguez García v. UCA,* 200 DPR 929, 943 (2018); Art. 1207 del Cód. Civ. 1930, 31 LPRA ant. sec. 3372. Un contrato existe cuando una o varias partes prestan su consentimiento a obligarse a dar alguna cosa o prestar algún servicio. *Id.,* págs. 726-727; Art. 1206 del Cód. Civ. de 1930, 31 LPRA ant. sec. 3371. El pacto será validado si concurren tres elementos esenciales, a saber: consentimiento, objeto y causa. *Id.,* pág. 727 y la jurisprudencia allí citada; Art. 1213 del Cód. Civ. de 1930, 31 LPRA ant. sec. 3391.

Las obligaciones nacen de la ley, los contratos, los cuasicontratos y los actos y omisiones en que intervengan la culpa o negligencia. *Demeter Int'l v. Srio. Hacienda,* 199 DPR 706, 726 (2018); Art. 1042 del Cód. Civ. de 1930, 31 LPRA ant. sec. 2992. "Las obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de los mismos". Art. 1044 del Cód. Civ. de 1930,

31 LPRA ant. sec. 2994. Este principio de *pacta sunt servanda* impone a las partes contratantes la exigencia de cumplir con lo pactado pues supone la inalterabilidad de los acuerdos contenidos en el contrato. *Rodríguez García v. UCA, supra,* pág. 943.

Claro está, existen contratos que exigen la realización de un ejercicio de interpretación a los fines de determinar la naturaleza de la obligación en que incurrieron las partes. *Nissen Holland v. Genthaller*, 172 DPR 503, 513 (2007); *S.L.G. Irizarry v. S.L.G. García*, 155 DPR 713, 725-726 (2001). A tales efectos, el Artículo 1233 del Código Civil de 1930 disponía que: "[s]i los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas. Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aquellas". 31 LPRA ant. sec. 3471. Al respecto, el Tribunal Supremo de Puerto Rico ha opinado que debe seguirse la letra clara de un contrato, cuando la misma refleja inequívocamente la voluntad de las partes. Por lo tanto, dicho principio impone a los tribunales que la interpretación conferida a un contrato no le reste efectividad a las cláusulas contractuales que fueron válidamente acordadas. Sin embargo, cuando no sea posible determinar la voluntad de las partes con la mera lectura literal de las cláusulas contractuales, entonces, se deberá recurrir a evidencia extrínseca para juzgarla, utilizando principalmente los actos anteriores, coetáneos y posteriores de los contratantes, el uso o costumbre y demás circunstancias indicativas de la intención contractual, incluyendo la ocasión, circunstancias, personas y el acuerdo que se intentó llevar a cabo. *Nissen Holland v. Genthaller, supra,* págs. 518-519.

(ii)

El derogado Código Civil de 1930, 31 LPRA ant. sec. 1 *et seq.*, define la sociedad como "un contrato por el cual dos o más personas se obligan a poner en común dinero, bienes o industria con ánimo de partir entre sí las ganancias". Art. 1556 del Cód. Civil de 1930, 31 LPRA sec.

4311. Como cualquier otro contrato, el contrato de sociedad queda perfeccionado cuando concurre el consentimiento de las partes sobre el objeto y la causa. Arts. 1213 y 1214 del Cód. Civil de 1930, 31 LPRA secs. 3391 y 3401; Véase, también, J. Puig Brutau, *Compendio de Derecho Civil*, 2da. Ed., Barcelona, Bosch, Casa Editorial, S. A., 1994, Vol. II, pág. 509. Así, la sociedad tiene su génesis a partir de la celebración contractual, si no se ha acordado algo distinto. Art. 1570 del Cód. Civil de 1930, 31 LPRA sec. 4341.

Debe tener un objeto lícito y establecerse para el interés común de los socios. Art. 1557 del Cód. Civil de 1930, 31 LPRA sec. 4312. De ordinario, el contrato de sociedad no exige requisitos de forma, **a menos que se aporten bienes inmuebles o derechos reales a la sociedad, para lo cual será necesario que conste en escritura pública.** (Énfasis nuestro). Art. 1558 del Cód. Civil de 1930, 31 LPRA sec. 4313. En ese sentido, se distingue por la *affectio societatis*, que significa la cooperación de sus miembros hacia un mismo fin de lucro. *Marrero Rosado v. Marrero Rosado*, 178 DPR 476, 488 (2010); *Quiñones Reyes v. Registrador*, 175 DPR 861, 874 (2009). La sociedad puede durar: 1) por el tiempo pactado; 2) por el tiempo que dure el negocio que haya servido de objeto a la sociedad, si el negocio tiene una vigencia limitada; y 3) durante la vida de los socios. Art. 1571 del Cód. Civil de 1930, 31 LPRA sec. 4342.

Asimismo, se extingue: 1) cuando vence el término pactado; 2) cuando se pierde la cosa que sirve de objeto; 3) cuando se termina el negocio que sirve de objeto; 4) por la muerte de cualquiera de los socios; 5) por voluntad de los socios; 6) cuando cualquiera de los socios adviene insolvente; 7) cuando el acreedor de uno de los socios embarga su participación en la sociedad; 8) cuando un socio anuncia de manera oportuna y de buena fe su intención de que así sea, si no se ha fijado un término para la duración de la sociedad y no surge de la naturaleza del negocio; y 9) cuando el socio de una sociedad constituida bajo un término determinado, tiene, a juicio de los tribunales, justa causa para solicitar

la disolución. *Marrero Rosado v. Marrero Rosado, supra*, pág. 489; Véase, también, Arts. 1591, 1596 y 1598 del Cód. Civil de 1930, 31 LPRA secs. 4391, 4396 y 4398. Una vez comienza el proceso de disolución de la sociedad, surge una etapa intermedia de liquidación de los negocios pendientes, hasta la materialización de su extinción. Puig Brutau, *op. cit.*, pág. 525.

## C.

El ordenamiento jurídico vigente a los hechos atinentes, el derogado Código Civil de 1930, *supra*, también permitía la adquisición de la propiedad y los demás derechos sobre los bienes, a través de la prescripción adquisitiva o usucapión, con o sin justo título y con o sin buena fe. Arts. 549, 1830, 1840 y 1869 del Cód. Civil de 1930, 31 LPRA ants. secs. 1931, 5241, 5261 y 5280; *Adm. Terrenos v. SLG Rivera-Morales*, 187 DPR 15, 26 (2012). **Mediante la figura de la usucapión se adquiere un derecho a favor de una persona, mientras se extingue el derecho de otra**. *Silva Wiscovich v. Weber Dental Mfg. Co.*, 119 DPR 550, 554 (1987). Siempre que el objeto o el derecho sea susceptible de apropiación por un tiempo determinado, según las condiciones que dicta la ley, el efecto de la usucapión constituye la adquisición del dominio. *Adm. Terrenos v. SLG Rivera-Morales, supra*; *Bravman, González v. Consejo Titulares*, 183 DPR 827, 838 (2011).

En lo que compete a este caso, la doctrina civilista reconoce la usucapión extraordinaria. *Adm. Terrenos v. SLG Rivera-Morales, supra*, pág. 27. Si bien la prescripción adquisitiva extraordinaria prescinde de la buena fe y el justo título, exigía como requisitos **la posesión ininterrumpida, pública, pacífica y en concepto de dueño, durante al menos treinta años**. Arts. 1841 y 1859 del Cód. Civil de 1930, 31 LPRA ants. secs. 5262 y 5280*; Sánchez González v. Registrador*, 106 DPR 361, 375. Salvo las excepciones establecidas por el ordenamiento, la usucapión extraordinaria puede perfeccionarse incluso contra un título

inscrito. *Adm. Terrenos v. SLG Rivera-Morales*, *supra*, pág. 30. Así, pues, en *Dávila v.* Córdova, *infra*, nuestro Tribunal Supremo acotó:

> Conclusión: para que se produzca la prescripción adquisitiva extraordinaria que establece el [A]rt. 1859 del Código Civil de Puerto Rico [de 1930], deben exigir nuestros tribunales de justicia la prueba de los siguientes hechos: (1) una **posesión continuada durante treinta años** sobre el inmueble, (2) por haberla así **tolerado el dueño** del inmueble, (3) ya que el **prescribiente ha entrado en posesión del inmueble sin autorización, permiso o licencia** otorgados por el dueño o en virtud de contrato celebrado con el dueño, (4) cuya posesión ha mantenido el poseedor en **concepto público de dueño, de acuerdo con la creencia colectiva de la comunidad en que vive**, no en virtud de la creencia propia que pueda tener el poseedor de ser el dueño del inmueble poseído, y (5) cuya **posesión resulte además pública, pacífica**, y (6) **sin que se haya interrumpido** naturalmente, o sea, por abandono de la cosa por el poseedor, por más de un año, o civilmente, en virtud de diligencia judicial o notarial, o **por un reconocimiento expreso o tácito del derecho del dueño hecho por el poseedor, antes de haber transcurrido los treinta años durante los cuales se consuma la prescripción**, y (7) **sin que el poseedor haya renunciado** expresa o tácitamente a su título por prescripción por alguna causa que resulte eficaz en derecho para tal renuncia, después de consumada la prescripción extraordinaria. *Dávila v. Córdova*, 77 DPR 136, 150-151 (1954); refrendado en *Adm. Terrenos v. SLG Rivera-Morales*, *supra*, págs. 28-29. (Énfasis nuestro).

Finalmente, es sabido que el tipo de posesión que se exige para poder adquirir el dominio de un bien inmueble mediante la prescripción adquisitiva ordinaria o extraordinaria es la **posesión civil**. *Adm. Terrenos v. SLG Rivera-Morales, supra,* pág. 29. El Art. 360 del Código Civil de 1930, 31 LPRA ant. sec. 1421, definía la "posesión civil" como la tenencia de una cosa y el disfrute de un derecho, unido a la intención de hacer suya la cosa o el derecho.

## D.

En nuestro ordenamiento jurídico es norma reiterada que los jueces y juezas del Tribunal de Primera Instancia están en mejor posición que los foros apelativos para poder aquilatar la prueba presentada por las partes. *González Hernández v. González Hernández,* 181 DPR 746, 776 (2011) citando a *Pueblo v. Miranda Ortiz,* 117 DPR 188, 191 (1986). Debido a esto, los foros superiores le brindamos gran respeto y deferencia a las conclusiones de hecho y apreciación de la prueba hecha

por los tribunales de instancia. *Id.* En ausencia de "pasión, prejuicio, parcialidad o error manifiesto" los tribunales apelativos nos abstendremos de intervenir en la apreciación de la prueba hecha por un foro primario. *Rodríguez v. Urban Brands,* 167 DPR 509, 522 (2006). Respecto a la deferencia brindada en la credibilidad y apreciación de la prueba oral, el Tribunal Supremo ha expresado:

> Hemos señalado que la determinación de credibilidad del tribunal sentenciador debe ser merecedora de gran deferencia por parte de los foros apelativos, por cuanto es el juez de instancia quien —de ordinario— está en mejor posición para aquilatar la prueba testifical desfilada, ya que fue quien oyó y vio declarar a los testigos. Más aún, el juez ante quien declaran los testigos es quien tiene la oportunidad de verlos y observar su manera de declarar, apreciar sus gestos, titubeos, contradicciones y todo su comportamiento mientras declaran. Estos factores van formando gradualmente en su conciencia la convicción en cuanto a si dicen la verdad. " '[L]a declaración de un testigo no contradicho sobre un hecho determinado, debe merecer crédito, a no ser que su versión sea físicamente imposible, inverosímil o que por su conducta en la silla testifical se haga indigno de crédito.' "[27] (Citas omitidas)

Pese lo anterior, el Tribunal Supremo ha expresado que cuando las conclusiones de hechos estén basadas en prueba pericial o documental los foros apelativos se encuentran en la misma posición que el foro primario para revisarlo. *González Hernández v. González Hernández, supra,* pág. 777 citando a *Sepúlveda v. Depto. de Salud,* 145 DPR 560, 573 (1998). Debido a esto, los foros revisores tendremos "facultad para adoptar su propio criterio en la apreciación y evaluación de la prueba pericial, y hasta para descartarla aunque resulte técnicamente correcta". *Id.* citas omitidas.

### E.

En lo atinente a los asuntos del caso que nos ocupa, es norma firmemente establecida que los foros apelativos no atenderán argumentos que no fueron esgrimidos ante el Tribunal de Primera Instancia. *Consejo de Titulares v. Triple-S,* 216 DPR __; 2025 TSPR 82; *Sánchez Ruiz v. Higuera Pérez et al.,* 203 DPR 982, 993 (2020); *Dorado*

---

[27] *Suárez Cáceres v. Com. Estatal Elecciones,* 176 DPR 31, 67-68 (2009).

*del Mar v. Weber et als.*, 203 DPR 31, 52 (2019); *Trabal Morales v. Ruiz Rodríguez,* 125 DPR 340, 351 (1990).

**III.**

En la causa de autos, el señor Ramírez alega que el TPI incidió al resolver que no se configuró una sociedad entre éste y el apelante, puesto que, a su entender, la prueba documental y testifical lo contradice. En adición, el apelante aduce que el foro de instancia le ha privado injustamente del derecho que tiene como participante de la comunidad de bienes habida entre él y el causante. Asimismo, argumenta que el Tribunal de Primera Instancia erró tras permitir que se violentase la doctrina de los actos propios, lo que a su vez resultó en un enriquecimiento injusto a favor de la parte apelada. En suma, el apelante trae a la atención de este Foro revisor, por primera vez, el argumento sobre la constitución de una comunidad de bienes y la existencia de un enriquecimiento injusto.

Por su parte, la Sucesión Caballero resalta que las deposiciones a las que el señor Ramírez hace referencia en su alegato no forman parte de la prueba que el TPI aquilató. Puntualiza que las referidas deposiciones no fueron ofrecidas como prueba durante los cinco (5) días de juicio en su fondo. En síntesis, aseveró que varias de las personas depuestas no fueron utilizadas como testigos, y en todo caso, correspondía que el señor Ramírez ofreciera la transcripción de los testimonios vertidos durante el juicio. Añade que de la reconvención y la *Sentencia* apelada no se desprende referencia alguna a la existencia de una comunidad de bienes ni de un enriquecimiento injusto. Arguye que, al ser levantados por primera vez en esta etapa, el Tribunal de Apelaciones está impedido de atender estos planteamientos.

El apelante reafirma su postura en la *Réplica a Oposición a Moción de Reconsideración* presentada, e indica que la parte apelada pretende obviar el mandato del Tribunal de Apelaciones emitido en el caso KLAN202200266. En riposta, la parte apelada arguye en su *Dúplica en*

*Cumplimiento de Orden* que, contrario a lo imputado por el apelante, el TPI sí cumplió con el mandato del foro apelativo.

No nos convencen los argumentos esgrimidos por el señor Ramírez. Veamos.

Como cuestión de umbral, debemos enfatizar que el apelante no sometió ante la consideración de este Foro revisor la Transcripción de Prueba Oral del juicio en su fondo. Como resultado, en ausencia de pasión, prejuicio, parcialidad o error manifiesto por parte del TPI, acogemos de manera íntegra las estipulaciones y las determinaciones de hechos esbozadas en el dictamen impugnado. Por ello, daremos entera deferencia a la apreciación de la prueba realizada por el foro *a quo*. Los errores señalados son susceptibles de ser discutidos de manera conjunta, por lo que así obraremos.

Con respecto a los planteamientos del señor Ramírez sobre la existencia de una comunidad de bienes y enriquecimiento injusto, resolvemos que no serán atendidos por este foro apelativo. Según discutido en el Acápite II de esta *Sentencia*, el Tribunal de Apelaciones está impedido de tomar en consideración aquellos argumentos que no fueron esbozados en el foro de instancia. Examinado el expediente ante nos, no se desprende que el apelante haya alegado en el TPI la posible configuración de una comunidad de bienes entre el causante y el apelante, así como la existencia de un enriquecimiento injusto.

Referente a la configuración de un contrato de sociedad, según relatado en el tracto procesal, las partes estipularon en varias ocasiones durante la vigencia del litigio que **no existía escritura pública de sociedad mercantil o civil ni contrato de sociedad entre el apelante y el señor Caballero**.[28] A su vez, estipularon que las fincas en disputa eran de la titularidad del causante. Como se sabe, para que advenga a la

---

[28] Véase, *Informe sobre Conferencia Preliminar entre Abogados y Abogadas*, en los Autos Originales del caso, Tomo 1, 22 de agosto de 2016; *Moción Conjunta sobre Prueba* en los Autos Originales del caso, Tomo 4, 22 de octubre de 2024.

vida una sociedad no se requiere mayor formalidad, a menos que los socios acuerden aportar bienes inmuebles o derechos reales. Ante ese escenario, las partes deben configurar el contrato de sociedad mediante escritura pública. Aunque el apelante alude a determinadas transcripciones de deposiciones en su alegato para sustentar sus alegaciones, se desprende del legajo apelativo ante nuestra consideración que el propio apelante estipuló y admitió que el señor Caballero y él nunca firmaron un contrato de sociedad. En este caso, el apelante necesitaría presentar copia de una escritura pública de un contrato de sociedad, puesto que la controversia medular se encuentra íntimamente atada a las propiedades descritas en el Acápite I de esta *Sentencia.* Por ello, al igual que el foro apelado, colegimos que no se configuró una sociedad entre el señor Ramírez y el señor Caballero.

Toda vez que el apelante no trajo a la atención de este Tribunal de Apelaciones planteamiento alguno sobre la posible consumación de la prescripción adquisitiva, no intervendremos con la conclusión del foro impugnado sobre su inexistencia.

**IV.**

Por los fundamentos antes expuestos, confirmamos la *Sentencia* apelada.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones